UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| PAMELA J. JONES, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 10 - CV - 1320 |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

## ORDER & OPINION

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 6) and Defendant's Motion for Summary Affirmance and Memorandum in Support (Doc. 7 & 8). For the reasons set forth below, Plaintiff's Motion for Summary Judgment (Doc. 6) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 7) is GRANTED.

BACKGROUND

**I. Procedural History**

Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") on May 21, 2008, alleging a disability onset date of January 1, 2001. Her application was denied on August 1, 2008. (Doc. 4 at 55). Plaintiff filed for reconsideration of the denial, which was subsequently affirmed on September 19, 2008. (Doc. 4 at 56). Plaintiff then requested a hearing before an

1

Administrative Law Judge ("ALJ") on December 10, 2008. (Doc. 4 at 55-56). This hearing took place before ALJ Shreese M. Wilson on February 11, 2010, where Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert. (Doc. 4 at 21-54).

After the hearing, ALJ Wilson issued a decision that Plaintiff was not disabled, as defined by the Act, because prior to her date last insured of December 31, 2004, she did not have a "severe" impairment - that is, a medically determinable impairment or combination of impairments that "significantly limit[ed] her physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (providing that if a claimant does not have a "severe" impairment, the Agency will deny her claim at step two without considering her age, education, or work experience).[1]

Thereafter, Plaintiff filed a request with the Appeals Council for review of the ALJ's decision. (Doc. 4 at 70-71). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security ("the Commissioner") in this case. (Doc. 4 at 1-4, 11-16). On October 14, 2010, Plaintiff filed the instant action in this Court (Doc. 1) seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405 (g). On March 14, 2011, Plaintiff filed her Motion for Summary Judgment (Doc. 6) and on April 28, 2011, Defendant filed its Motion for Summary Affirmance and Memorandum in Support (Doc. 7 & 8).

---

[1] ALJ Wilson determined that January 2001 (onset date) through December 31, 2004 (date last insured) was the only relevant time period because Plaintiff's disability insured status expired on December 31, 2004 and Plaintiff is not entitled to benefits for any disability that did not onset prior to its termination. 42 U.S.C. §§ 423(a)(1)(A), (c)(1), 414(a) (2010).

2

**II. Relevant Medical History**

In September 1997, Plaintiff was experiencing lower back pain, which had worsened over the last two months. (Doc. 4 at 15, 213). A computed tomography (CT) scan taken at that time showed a disc herniation. (Doc. 4 at 370). Plaintiff underwent corrective surgery and nerve root decompression performed by Dr. Cram in September 1997. (Doc. 4 at 218-19). Post-operatively, an MRI study showed only moderate loss of disc space height at L4-L5. (Doc. 4 at 369).

Shortly after the surgery, Plaintiff began to experience leg pain to the extent that she felt like she was unable to walk and at times experienced some numbness. (Doc. 4 at 219). Dr. Cram's notes taken after the surgery show steady improvement and Plaintiff exhibited an eagerness to walk without an ankle brace. (Doc. 4 at 220-22). Plaintiff's leg was feeling stronger and she decided that she was able to walk without the brace from October 1997 through December 1997. (Doc. 4 at 220-21). She was advised to continue ankle strength conditioning exercises. (Doc. 4 at 222-23). After seeing Plaintiff on January 23, 1998, Dr. Cram noted that Plaintiff had began to experience some back discomfort. (Doc. 4 at 221). By April 1998, Dr. Cram advised Plaintiff that an ankle brace was needed "for a number of months." (Doc. 4 at 224).

According to the medical records, Plaintiff had no further medical issues until April 2001, three years later, when she complained of a "two-week history" of waking up with low back and right leg pain. (Doc. 4 at 227). However, an MRI taken during that time showed no significant changes. (Doc. 4 at 227). By June 2001,

Plaintiff stated that she felt really "good" with no back or leg pain; she demonstrated good flexion, and was once again advised to continue daily exercises for an indefinite period. (Doc. 4 at 227). During the time period between June 2001 and the date last insured, Plaintiff had stopped seeking medical attention for her back and leg, noting the death of her primary physician (Dr. Cram) and her financial situation. (Doc. 4 at 44-45).

Throughout 2003, Plaintiff also complained of coughing and chest congestion and on December 10, 2003, Dr. Sidler (Plaintiff's new primary physician) noted that Plaintiff's cough was "better." (Doc. 4 at 230). At this point, Dr. Sidler advised Plaintiff to quit smoking. (Doc. 4 at 230). Dr. Sidler continued to treat Plaintiff throughout 2004 for coughing and chest congestion. (Doc. 4 at 229-30).

### III. Hearing Testimony

On February 11, 2010, ALJ Wilson held a hearing on Plaintiff's application for benefits, at which Plaintiff was represented by Attorney Susan O' Neal. (Doc. 4 at 68). At this hearing, Plaintiff testified that she was unable to work after 2000 due to it being "more than she could handle." (Doc. 4 at 32). Plaintiff testified that she was instructed to get a permanent ankle brace in 2000, but she "was determined to do it without it." (Doc. 4 at 34).

Plaintiff testified that prior to discontinuing her employment in 2001, she worked as a seamstress at a uniform shop. (Doc. 4 at 31). At this position, Plaintiff helped out the seamstress, and would assist customers. (Doc. 4 at 31). Plaintiff was only able to work part-time and testified that "it was a very low-key store and not

usually a whole lot of business, so it was kind of like sitting mostly." (Doc. 4 at 35 - 36).

From the time Plaintiff discontinued her employment at the uniform shop in 2001 until 2004, she testified that she "tired very easy" and was unable to sit in one position for too long. (Doc. 4 at 37). She described the feeling in her leg as "aches" and testified that she was experiencing "periods of discomfort" in her lower back. (Doc. 4 at 38). She testified that her pain only "sometimes" got worse with activity, "but not always," and only "sometimes" was she required to take pain medication. (Doc. 4 at 38-39). Plaintiff testified that from June 2001 until the date last insured, she "had trouble breathing, but mainly when [she] had an infection or a cold" and that she had had breathing problems since she was young. (Doc. 4 at 43). But Plaintiff testified that prior to 2004, her leg and back issues were her most predominate health concerns. (Doc. 4 at 43).

A vocational expert, Mr. Dennis W. Gustafson, also testified at the hearing. (Doc. 4 at 46-53). Mr. Gustafson testified that a hypothetical claimant of the same age, education, and work experience as Plaintiff, who required the option of sitting or standing with the need to change positions at intervals not to exceed thirty minutes would be capable of sedentary work. (Doc. 4 at 48-49). Sedentary work is defined as a position where the employee is sitting more than two-thirds of the working day. (Doc. 4 at 52). Mr. Gustafson also testified that a hypothetical claimant of the same age, education, and work experience as Plaintiff, who was required to change positions once an hour for five minutes would be capable of

5

either light or sedentary work. (Doc. 4 at 49-40). Light work is defined as a position where the employee is sitting less than one-third of the time. (Doc. 4 at 52).

Mr. Gustafson concluded that there are approximately 11,600 light unskilled jobs in Illinois and 318,200 light unskilled jobs in the United States. (Doc. 4 at 50). He also concluded that an individual would have to be able to work 40 hours a week to work at a competitive substantial gainful activity ("SGA") level job and could not be absent more than two times per month, not exceeding an ongoing basis, in order to remain in that position. (Doc. 4 at 52-53).

## IV. ALJ's Decision

ALJ Wilson issued her decision on March 12, 2010. (Doc. 4 at 11-16). ALJ Wilson considered the following issues: (1) whether Plaintiff was disabled pursuant to § 216(i) and § 223(d) of the Act[2], and (2) whether the insured status requirements of § 216(i) and § 223(d) of the Act were met.[3] (Doc. 4 at 11). After careful consideration of all the evidence, the ALJ concluded that Plaintiff was not under a disability, within the meaning of the Act, from January 1, 2001, through the date last insured (December 31, 2004). (Doc. 4 at 11).

Under the Act, disability is defined as the inability to engage in any SGA by reason of any medically determinable physical or mental impairment, or combination of impairments, that can be expected to result in death or that has

---

[2] An individual is disabled if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).
[3] An individual must have established a disability on or before the date last insured to be entitled to a period of disability and disability insurance benefits. 42 U.S.C. § 423(c)

6

lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. 404.1520(a). The steps are: (1) whether Plaintiff is engaged in substantial gainful activity, 20 C.F.R. 404.1520(b); (2) whether Plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that are "severe," 20 C.F.R. 404.1520(c); (3) whether Plaintiff's impairments or combination of impairments meets or medically equals the criteria of an impairment, 20 C.F.R. 404.1520(d); (4) whether Plaintiff has the residual functional capacity to perform the requirements of her past relevant work, 20 C.F.R. 404.1520(f); and (5) whether Plaintiff is able to do any other work considering her: residual functional capacity, age, education, and work experience, 20 C.F.R. 404.1520(g). If it is determined that Plaintiff is or is not disabled at any step of the evaluation process, the evaluation will not go on to the next step. (Doc. 4 at 12).

**A. Substantial Gainful Activity**

SGA is defined as work activity that is both substantial and gainful. (Doc. 4 at 12). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. 404.1572(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. 404.1572(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she

7

has demonstrated the ability to engage in SGA. 20 C.F.R. 404.1574 and 404.1575. If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. (Doc. 4 at 12). If the individual is not engaging in SGA, the analysis proceeds to the second step. (Doc. 4 at 12).

The ALJ determined that Plaintiff did not engage in SGA during the period from her alleged onset date through her date last insured. (Doc. 4 at 13). In order to come to this conclusion, the ALJ noted that Plaintiff has only a ninth grade education and past work experience as a banquet server, in sales and as a seamstress. (Doc. 4 at 14). Since Plaintiff did not engage in SGA, ALJ Wilson proceeded to step two, which requires a finding of a medically determinable impairment that is severe or a combination of impairments that are severe.

**B. Medically Determinable Impairment**

An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. (Doc. 4 at 12). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. 404.1521. If Plaintiff does not have a "severe" medically determinable impairment or combination of impairments, she is not disabled. (Doc. 4 at 12). If Plaintiff has a "severe" impairment or combination of impairments, the analysis proceeds to the third step. (Doc. 4 at 12).

The ALJ determined that through the date last insured, Plaintiff had a degenerative disc disease, which was a medically determinable impairment. (Doc. 4 at 13). However, through the date last insured, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months; therefore Plaintiff did not have a severe impairment or combination of impairments. (Doc. 4 at 13). The ALJ used a two-step process in determining whether Plaintiff had a severe medically determinable impairment. First, the ALJ had to determine whether there was an underlying medically determinable physical or mental impairment, which could be shown by medically acceptable clinical and laboratory diagnostic techniques, which could reasonably be expected to produce Plaintiff's pain or other symptoms. Second, the ALJ had to determine the intensity, persistence, or functionally limiting effects of Plaintiff's pain or other symptoms. (Doc. 4 at 14).

With respect to the first step, the ALJ determined that Plaintiff's medically determinable impairment could have been reasonably expected to produce the alleged symptoms. (Doc. 4 at 15). Plaintiff filed for DIB due to post-operative complications with her lower back and nerve damage. (Doc. 4 at 14). The ALJ determined that these symptoms could easily be explained by the diagnosis of her degenerative disc disease. (Doc. 4 at 15).

However, the ALJ then found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the

9

extent they were inconsistent with finding that the claimant had no severe impairment or combination of impairments prior to the date she was last insured for disability benefits. (Doc. 4 at 15). Plaintiff alleged that she was disabled due to chronic obstructive pulmonary disorder ("COPD") and the residual effects of her back surgery. (Doc. 4 at 15). In September 1997, Plaintiff was suffering from back pain and subsequently had corrective surgery. (Doc. 4 at 15). In April 2001, Plaintiff complained of lower back pain, however, an MRI failed to evidence further complications. (Doc. 4 at 15). Several months later, Plaintiff stated that she was doing relatively well and her examination was unremarkable. (Doc. 4 at 15-16). Plaintiff testified that she did not seek medical attention for her back and leg issues from June 2001 through her date last insured because of Dr. Cram's death and a lack of financial resources. (Doc. 4 at 16). Plaintiff failed to furnish evidence or give information of treatment for the time prior to her date last insured. (Doc. 4 at 16). Plaintiff testified that prior to her date last insured her main problems were her back and leg issues and her COPD breathing issues did not become severe until after the date last insured. (Doc. 4 at 42-43).

Therefore, the ALJ found that because she did not find Plaintiff's statements concerning the intensity, persistence, and limiting effects of her degenerative disc disease to be credible, Plaintiff was not under a disability, as defined by the Act, at any time from January 1, 2001, the alleged onset date, through December 31, 2004, the date last insured. 20 C.F.R. 404.1520(c). Because ALJ Wilson made this

determination, she did not have to proceed to steps three through five of the analysis.

## DISCUSSION

**I. Legal Standard**

To be entitled to disability benefits under the Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). Pursuant to statutory authority, the Secretary of Health and Human Services ("the Secretary") has promulgated regulations establishing a five-step sequential analysis for determining whether a claimant is disabled. 20 C.F.R. § 416.920. The first step of the process requires the Secretary to make a factual determination as to whether the claimant is engaging in SGA. 20 C.F.R. § 416.920(a) *see also Dotson v. Shalala*, 1 F.3d 571, 574 (7th Cir. 1993).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the third step.[4] At the third step, the Commissioner compares the claimant's

---

[4] ALJ Wilson's analysis concluded after she found Plaintiff's medically determinable impairment not severe.

impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's residual functional capacity is evaluated to determine whether the claimant can pursue his past relevant work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If she cannot, then at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v). The claimant has the burden of proving a disability through step four of the analysis, i.e. she must demonstrate an impairment that is of sufficient severity to preclude her from pursuing her past work. *Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992). Once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of SGA. *Id.*

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "[t]he findings of the Commission of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In reviewing the Commissioner's decision, the Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its own judgment for that of the Commissioner. *Id*. The Court must ensure that the Commissioner "builds an accurate and logical bridge from the evidence to this conclusion," even though he need not have addressed every piece of evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

## II. Analysis

Plaintiff, who is appealing the Commissioner's decision, submitted a brief statement along with over 500 pages of documents that are part of the transcript. Plaintiff asserts that the ALJ's decision was not supported by substantial evidence. (Doc. 9). Specifically, she is alleging that the ALJ made two findings that were not supported by substantial evidence: (1) Plaintiff suffered from only one medically determinable impairment - degenerative disc disease; and (2) the claimant did not suffer from a severe impairment or combination of impairments, which were severe. (Doc. 9).

### A. Failure to Recognize Other Medically Determinable Impairments

To help support her argument that ALJ Wilson failed to recognize Plaintiff's other impairments as medically determinable impairments, Plaintiff submitted various medical records, including records showing that: (1) Plaintiff was diagnosed in 1997 as having a herniated disk at L4-L5 (Doc. 4 at 215-216); (2) Plaintiff had back surgery that same year, had ankle weakness of the lower right extremity and had to wear an ankle brace (Doc. 4 at 221); (3) an MRI performed on April 18, 2001 revealed disc dessication and mild disc bulging (Doc. 4 at 368-369); and (4) in 2003 Plaintiff was diagnosed with COPD.

This Court will only remand if the ALJ's decision was not based on "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333. Here, ALJ Wilson considered Plaintiff's entire medical record beginning in 1990 through present. (Doc. 4 at 192-546). However, the ALJ noted that the only relevant medical time period was from the onset date (January 1, 2001) through the date last insured (December 31, 2004). (Doc. 4 at 11). Plaintiff testified that during that time period, her main problems were her back and leg issues and that her COPD breathing issues did not become severe until after her date last insured. (Doc. 4 at 42-43).

The ALJ made a factual determination that during the relevant time period Plaintiff did suffer from a medically determinable impairment: degenerative disc disease. (Doc. 4 at 13). The ALJ discounted the evidence regarding the COPD because even though it has gotten progressively worse, during the relevant time period it was not, as acknowledged by Plaintiff, a major or "severe" problem. (Doc. 4 at 16). During the first quarter of 2001, Plaintiff experienced flare-ups related to her surgically treated back problems and was treated at OSF Saint Francis Medical Center on April 18, 2001. (Doc. 4 at 368). An MRI of her lumbosacral spine failed to evidence a recurrent or residual disc herniation. (Doc. 4 at 368-369). On May 17, 2001, Plaintiff was seen again at OSF Neurology Clinic for evaluation of her lower back pain and possible nerve conduction study (NCS) and electromyography (EMG). (Doc. 4 at 210). At that examination, Plaintiff reported that she was doing relatively

well until late March 2001 and noted no other new symptomatology. (Doc. 4 at 210). Examination of Plaintiff was unremarkable except a mild left steppage in her gait. (Doc. 4 at 210).

The treating physician, Dr. Zalleck elected to defer EMG and NCS in light of Plaintiff's improvement of symptomatology compared with her reported symptom onset date of March 2001, and the stability of strength. Accordingly, Dr. Zalleck prescribed a trial of Quinine 300 mg for Plaintiff's leg cramps. (Doc. 4 at 210).

At the time of her last follow-up visit to Dr. Cram, in connection with her back surgery (Doc. 4 at 226), Plaintiff stated that she felt really "good" and that she did not have any back or leg pain; and that she was feeling a lot stronger. (Doc. 4 at 227). Examination revealed a good curvature with no accompanying lumbar percussion tenderness. (Doc. 4 at 227). She flexes to eighty degrees, extends to ten degrees, lateral flexion to fifteen degrees fairly briskly with no pain. (Doc. 4 at 227). Dr. Cram also noted that Plaintiff was not consistently following a daily aerobic exercise regimen, which he stressed she should continue, based upon MRI evidence of disc degeneration. (Doc. 4 at 227). He also attributed Plaintiff's recent flare-ups to her failure to adhere to daily aerobic training (as she suggested herself at her initial visit on April 9, 2001). (Doc. 4 at 227). Dr. Cram prescribed that Plaintiff should adhere to her daily aerobic exercise regimen indefinitely. (Doc. 4 at 227). Plaintiff testified that she did not seek medical attention between June 2001 through date last insured because of her physician's death and her lack of financial resources. (Doc. 4 at 44-45).

While the ALJ did not explicitly consider every piece of evidence put forward by the Plaintiff which showed a mention of COPD, she considered enough to build an accurate and logical bridge from the evidence in the record to conclude that Plaintiff only suffered from one medically determinable impairment - degenerative disc disease, and was not severely suffering from COPD before the date last insured. *See Dixon*, 270 F.3d at 1176. Accordingly, her findings were based on substantial evidence and will not be disturbed.

### B. Failure to Find the Impairment Severe

Plaintiff also argues that ALJ Wilson failed to find her impairment severe. (Doc. 9). To support this contention, Plaintiff brought forth evidence showing that Plaintiff's surgeon said on at least two occasions that Plaintiff was limited to sedentary work because of her health problems. (Doc. 9).

The ALJ found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months; therefore, Plaintiff did not have a severe impairment or combination of impairments. (Doc. 4 at 13). Plaintiff testified that during the relevant time period her main problems were her back and leg issues and her COPD breathing issues did not become severe until after her date last insured. (Doc. 4 at 42-43). There was ample evidence showing that prior to 2004, Plaintiff had a history of steady improvement to the extent that she felt really "good" and decided to walk without her recommended ankle brace. (Doc. 4 at 220-27). Additionally, from June 2001 through the date last

insured, Plaintiff testified that she failed to seek medical attention for her back and leg, due to the death of her primary physician and her lack of financial resources. (Doc. 4 at 44-45).

While the ALJ did not explicitly consider every piece of evidence put forward by the Plaintiff, she considered enough to build an accurate and logical bridge from the evidence in the record to conclude that Plaintiff's medically determinable impairment was not severe during the relevant time period. *See Dixon*, 270 F.3d at 1176. Accordingly, her findings were based on substantial evidence and will not be disturbed.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 6) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 7) is GRANTED. THE CLERK IS DIRECTED TO ENTER JUDGMENT IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF. IT IS SO ORDERED.

CASE TERMINATED.

Entered this 13th day of June, 2011.

s/ Joe B. McDade
                              JOE BILLY McDADE
                       United States Senior District Judge